Estate of William Frank Schenck, Deceased, Lucille Schenck, Administratrix, and Lucille Schenck v. Commissioner.Estate of Schenck v. CommissionerDocket No. 45484.United States Tax CourtT.C. Memo 1961-241; 1961 Tax Ct. Memo LEXIS 108; 20 T.C.M. (CCH) 1252; T.C.M. (RIA) 61241; August 28, 1961Walter L. Mims, Esq., and Robert R. Buntin, Esq., for the petitioners. D. Louis Bergeron, Esq., and S. George Voss, Esq., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Additions to TaxYearDeficiencyUnder Sec. 293(b) 11948$21,783.50$10,891.751949182.2091.10The issues to be decided are whether petitioners: (1) Understated their 1948 income from business by: (a) understating liquor sales, (b) overstating liquor opening inventory, (c) overstating liquor purchases, (d) overstating repairs and maintenance expenses, (e) overstating other liquor expenses, (f) overstating liquor "Black Market Tax" expenses, and (g) understating other adjustments and closing liquor inventory; (2) Understated their 1948 net rental income; (3) Understated their 1948 capital gains income; (4) Improperly claimed personal exemptions*110 for their children in 1948; (5) Improperly claimed certain itemized deductions for 1948; (6) Were entitled to carry over their claimed 1947 net operating loss to their 1948 or 1949 returns; (7) Understated their 1949 income; and (8) Were guilty of fraud with intent to evade tax. Findings of Fact William Frank Schenck, also known as Frank Schenck, and Lucille Schenck, also known as Lucille C. Schenck, were, at all times herein material, husband and wife residing at 765 West Beach, Highway 90, Biloxi, Mississippi. In 1948 and 1949 they filed joint individual income tax returns with the collector of internal revenue for the district of Mississippi. William Frank Schenck, hereinafter sometimes referred to as "decedent," died on or about March 21, 1959, and Lucille Schenck, hereinafter sometimes referred to as "Lucille," was appointed administratrix of decedent's estate on or about November 27, 1959, by the chancery court of Harrison County, Mississippi, the county wherein they resided. By order of this Court dated December 14, 1959, and amended January 7, 1960, Lucille Schenck, administratrix of the estate of William Frank Schenck, deceased, was substituted as party petitioner*111 in the place of William Frank Schenck. Lucille Schenck was and remains a petitioner in her own right. Decedent and Lucille hereinafter will sometimes be referred to as "petitioners." Issue (1)(a) Liquor - Net Sales - 1948 During the years in question, petitioners were engaged in the purchase and sale of whiskey and wine at their West Beach residence and a warehouse adjacent thereto. Decedent was the general manager, doing all of the whiskey and wine purchasing as well as most of the selling which was done from the previously mentioned West Beach premises. The business was for Federal and State purposes registered in Lucille's name and was operated as Cream of Mississippi Wholesale Beverage Company. Lucille did some of the whiskey and wine selling, particularly when decedent was away on buying trips. In addition, a niece did some of the business book work and a helper worked in petitioners' warehouse and sometimes drove a truck for decedent. Most but not all of the sales were made for cash. Records of whiskey sales consisted of invoices, each prepared at the time of the sale, at which time the customer received the carbon copy. Decedent and Lucille were the only ones who*112 prepared invoices. Petitioners did not maintain formal books of account for their liquor business or any other income-producing activities during 1948 and 1949. Respondent determined that petitioners' sales in 1948 to John P. Barmer, Sr., hereinafter sometimes referred to as "Barmer," were $27,619.63 and that they were understated by $20,575.70 on petitioners' 1948 return. Respondent also determined that petitioner's sales in 1948 to "Joe Fore" were $31,991.64 and were correctly reported on petitioners' 1948 return. Petitioners' sales in 1948 to Barmer amounted to $39,035.57. Of this amount, $7,043.93 was sold to Barmer in his own name and $31,991.64 was sold to Barmer on the account of Joe Fore. Petitioners did not know any person named Joe Fore. Barmer was sometimes extended credit. Barmer's checks to petitioners were frequently not for the exact amounts of his purchases. Petitioners sometimes cashed Barmer's checks as an accommodation. On their 1948 return petitioners did not understate their sales to Barmer or to the apparently fictitious Joe Fore. Respondent determined petitioners' sales in 1948 to Stanley's Place were $2,811.23 and were understated by $67.98 on petitioners' *113 1948 return. Petitioners' sales in 1948 to Stanley's Place amounted to $2,743.25. On their 1948 return petitioners did not understate their sales to Stanley's Place. Respondent determined petitioners' sales in 1948 to James E. ("Skinny") Hartzog, hereinafter sometimes referred to as "Hartzog," were $41,987.87 and were understated by $204.34 on petitioners' 1948 return. Petitioners' sales in 1948 to Hartzog were in the amount and were understated by the amount determined by respondent. Respondent determined petitioners' sales in 1948 to E. C. Neely, hereinafter sometimes referred to as "Neely, hereinafter sometimes referred to as "Neely," were $2,038.55 and were understated by $100 on petitioners' 1948 return. Petitioners' sales in 1948 to Neely amounted to $1,938.55. On their 1948 return petitioners did not understate their sales to Neely. Respondent determined petitioners' sales in 1948 to the Biloxi Wine Cellar were $6,817.85 and were understated by $146.88 on petitioners' 1948 return. Petitioners' sales in 1948 to Biloxi Wine Cellar were $6,670.97. On their 1948 return petitioners did not understate their sales to the Biloxi Wine Cellar. Respondent determined petitioners' *114 sales in 1948 to Moody Grishman's (hereinafter sometimes referred to as "Grishman") Trade Winds Restaurant were $3,204.59 and were understated by $194.56 on petitioners' 1948 return. On their 1948 return petitioners did not understate their sales to Grishman. Respondent determined petitioners erred in adding the totals of their invoices of sales and that this error resulted in an overstatement of liquor sales on petitioners' 1948 return in the amount of $1,267.06. Summary of Findings as toUnderstatement of 1948 Liquor SalesCustomerRespondentFindingBarmer$20,575.700Stanley's Place67.980Hartzog204.34$ 204.34Neely100.000Biloxi Wine Cellar146.880Grishman194.560Error in addition(1,267.06)(1,267.06)Totals$20,022.40[1,062.72)Issue (1)(b). Liquor - Opening Inventory - 1948. Petitioners estimated opening liquor inventory on their 1948 return thusly: Cases Purchased as per Invoices7935 CasesAdditional Cases per list fromBlack Market Tax -Whiskey208Wine45253Purchases8188Inventory End 12-31-487957393Sold7776Estimated Inventory Begin-ning383Estimated Begin Inven-tory383 CasesPurchases81888571Sales7776Inventory End795 CasesAvg. Cost 5.00 30%245 Wine1229.53Avg. Cost 38.77 70%550 Whiskey21326.67795 Cases22556.20Inventory Beginning:383 Cases30% Wine114 at 5.00570.0070% Whiskey269 at 38.7710429.1310999.13*115 Respondent determined that petitioners' opening inventory was 130 cases of whiskey valued at $6,240. Petitioners' 1947 return claimed a substantial loss resulting from a hurricane that year. The amount of loss due to destruction of whiskey was claimed to be $62,400 less a salvage of 130 cases valued at $6,240. Petitioners re-entered the wholesale whiskey business after the hurricane and prior to the end of 1947. We find that petitioners' opening liquor inventory in 1948 was $6,240. Issue (1)(c). Liquor - Purchases - 1948. On their 1948 return, petitioners itemized purchases in 1948 of 7,935 cases of wines and whiskies at a total cost of $217,800.07. On the summary income and expenses schedule of their return, this figure was erroneously transcribed as $217,800.17. Petitioners also reported that their Black Market Tax records showed purchases of an additional 253 cases at a total cost of $8,289.16. We find petitioners expended $217,800.07 for purchases of whiskey in 1948, as determined by respondent. Issue (1)(d). Repairs and Maintenance - 1948. Petitioners' schedule of business income and expenses attached to their 1948 return included an item "Repairs & Maintenance*116 - Schedule 1032.75." No schedule of repairs and maintenance expenses was in fact attached to the return. Respondent disallowed the entire amount. Issue (1)(e). Liquor - Expenses. Petitioners set forth, in a schedule attached to their 1948 return, a large number of items listed as "EXPENSE." The total, as set forth and carried over to the summary income and expense schedule, was $7,133.77. The items listed in the schedule in fact totaled $7,133.66. Of this amount, items totaling $949.31 were disallowed by respondent either because they were personal and non-deductible, incurred in 1947, unsupported by invoices at the time of the investigation (1952), or duplications of items. Issue (1)(f). Liquor - Black Market Tax. Petitioners claimed a deduction on their 1948 return of $13,271.09 on account of "Black Market Tax." Respondent disallowed $4,339.59 of that deduction and allowed $8,931.50. Mississippi levied a tax on each case of liquor unlawfully sold by a wholesaler in that state. It required this "Black Market Tax" to be paid each month by wholesalers on account of liquor purchases made by them during the preceding month. Petitioners paid to Mississippi $8,931.50 in*117 Black Market Tax in 1948 on account of purchases made during 1948 and $1,506.15 in January 1949 on account of purchases made in December 1948. In addition, in 1948 Pete Murphey paid to the State of Mississippi $939.25 on account of petitioners' Black Market Tax. Petitioners also claimed on the Black Market Tax schedule of their 1948 return a deduction for an item "Bal. Paid for June, Dec. & Errors 1894.19." Petitioners' annual accounting period was the calendar year. Petitioners reported their income on the cash receipts and disbursements method of accounting. Issue (1)(g). Liquor - Other Adjustments and Closing Inventory. Respondent determined that petitioners' 1948 net income was understated by an amount of $7,070.75 on account of "Other adjustments including closing inventory." We find petitioners' 1948 net income was not understated on account of "Other adjustments including closing inventory." Issue (2). Rental - 1948. The Town Tavern, a building located at 119 East Howard Avenue, Biloxi, Mississippi, was rented by petitioners to Harry Hoffer, hereinafter sometimes referred to as "Hoffer," during the six months prior to its sale on June 30, 1948. A newsstand*118 on the same property was rented to Harry C. Fields during those six months. Hoffer paid petitioners a rental of $225 per month, for a total of $1,350 during 1948. Harry C. Fields paid petitioners a total rental of $600 during 1948. Petitioners' gross rental income from this property in 1948 was $1,950. Petitioners' expenses in connection with the rental of this property included depreciation on the building and on the improvements to it. Respondent allowed a deduction of $375 as an "adjustment." We find that depreciation on the building amounted to $375 during the first six months of 1948 and that depreciation on the improvements amounted to $433.82 during that time. No evidence was presented and no determination was made regarding depreciation on the newsstand. Petitioners reported on their 1948 return a net rental income of $750. Issue (3). Capital Gain - 1948. During 1946, petitioners purchased from Sam Mitchell property including a building known as the Town Tavern and earlier known as the Bradford Building. The purchase price was $20,000; $5,000 down and $3,000 per year. The balance was paid in full in 1948. On or about June 30, 1948, the property was sold to Hoffer*119 for $30,000; $5,000 down and $5,000 per year. The final payment was made in 1951. Respondent has determined that the depreciation allowable or allowed on the building to the date of sale by petitioners amounted to $1,312.50. This building had been a funeral parlor for some time before it was purchased by petitioners. However, it had been used as a tavern immediately prior to the purchase. During the two years preceding the sale by petitioners to Harry Hoffer, petitioners expended $8,676.46 on improvements to the property, including new restrooms, refrigeration, a new glass front, a new bar, new plumbing fixtures, and other general renovation. The cost of the improvements was in addition to the purchase price and was not deducted by petitioners as expense items prior to 1948. Petitioners have established neither the useful lives of the improvements, their salvage value, nor the dates when the improvements were made. On the basis of the meager evidence presented, we find that the improvements were made on Jnuary 1, 1947, had useful lives of ten years, and had no salvage value. On their 1948 return petitioners reported $30,000 as the cost of the property, $3,000 as depreciation*120 reducing the property's basis, and a sales price of $30,000 for a profit on the sale of $3,000. Our findings result in a profit of $3,937.51, derived as follows: Sales price$30,000.00BasisPurchase price$20,000.00Depreciation allowed by respondent1,312.50$18,687.50Improvements$ 8,676.46Depreciation1,301.477,374.9926,062.49$ 3,937.51Issue (4). Dependency Exemptions. Petitioners' two minor children, Mary Helen Schenck, born in 1943, and Frank Schenck, Jr., born in 1945, resided with petitioners during the taxable years here at issue. Property held by those children was sold in 1948 for a profit of over $1,200. Lucille filed income tax returns for each of her children for 1948. The children had no income in 1948 other than from the sale of that property. Each child had a gross income of more $600than in 1948. Issue (5). Itemized Deductions. Petitioners itemized medical and dental expenses totaling $2,405.53 on their 1948 return. This amount was reduced by $529.38, that being five percent of petitioners' claimed adjusted gross income. Petitioners then claimed $1,876.15 allowable medical and dental expenses. In*121 addition they claimed a deduction of $90 on account of "Estimated state sales tax." Respondent disallowed these deductions, including the following statement in his statutory notice: In the absence of sufficient evidence to show that you are entitled to itemized deductions in an amount greater than that allowed [the $1,000 standard deduction], $966.15 of the amount claimed is disallowed. Issue (6). Carry-over of 1947 Net Operating Loss. On their 1947 return petitioners claimed a loss of $35,430 in consequence of damage to property resulting from a hurricane on September 19, 1947. The property so destroyed included a warehouse, petitioners' home, cottages put out for rent, and a substantial part of petitioners' liquor inventory. Petitioners did not carry forward this loss to their 1948 or 1949 returns. In their petition, petitioners assigned as error respondent's failure to give "effect to a net operating loss carryover from the year 1947." The record does not permit us to make any finding as to petitioners' incomes in 1945 and 1946, and the extent (if any) and nature of their loss in 1947. Issue (7). 1949 Income. Petitioners' 1949 return disclosed an adjusted gross*122 income of $2,188.97, computed and determined as follows: Income from BusinessWhiskey (1-1 to 4-6-49)$ 317.81Sawmill operations0Lease of Sawmill$400.00Less depreciation (fullyear)228.84171.16Total$ 488.97Capital Gain1,700.00Adjusted gross income per return$2,188.97Less Statutory deduction218.90Net income per return$1,970.07Less exemptions2,400.00Taxable income $0Petitioners terminated their wholesale liquor business on or about April 6, 1949. Income from the wholesale liquor business for the period January 1, 1949, to April 6, 1949 was computed as follows: Total Sales$72,418.36Less: Opening Inventory 1-1-49$22,556.20Add: Purchases44,849.07Total$67,405.27Less: Closing Inventory 4-6-490Cost of Sales67,405.27Gross Profit$ 5,013.09LessTransportation Cost$ 1,441.69Miscellaneous213.31Depreciation1,498.83Labor596.00Materials and Supplies336.17Taxes609.284,695.28Income from whiskey business re-ported$ 317.81 Included in the depreciation of $1,498.83 above is sawmill machinery depreciation of $228.84. That depreciation*123 item was also claimed as a deduction in arriving at the lease income. Respondent, in his statutory notice, adjusted petitioners' 1949 income as follows: Net income as disclosed by return$2,188.97Add: Net profit from sawmill and whiskeyoperations142.47Additional long-term capital gain3,385.60Total$5,717.04Less 10% statutory deduction571.70Net income as corrected$5,145.34 In his opening statement, respondent's attorney contended that petitioners' 1949 net income was understated on their return by $17,181.65. During the taxable year 1949 petitioners, prior to leasing the sawmill equipment, had sawmill operations in addition to their whiskey operations. Fitzgerald Brothers purchased from petitioners logs, crossties, and lumber as follows: 1- 5-49$ 617.341-12-491,000.671-26-49457.601-28-49151.442- 2-49543.152- 3-49242.622- 9-4948.532- 9-49362.692-16-49217.682-16-49164.842-23-49599.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.033- 2-4966.107-25-49149.04Total received$4,653.69During 1947, petitioners purchased land on which they subsequently erected a restaurant known as the Hurricane. In 1949, petitioners*124 sold this property and reported in their 1949 return a profit of $3,400. Respondent determined that petitioners realized a profit of $10,171.20 on the sale. Issue (8). Fraud. Neither Lucille nor decedent had ever prepared an income tax return for themselves or for anyone else. Petitioners' 1947 and 1948 returns were prepared for them by J. O. Jones, (hereinafter sometimes referred to as Jones), a certified public accountant. Petitioners' 1949 return was prepared for them by J. G. Worrell. No part of the deficiencies found in petitioners' 1948 and 1949 returns was due to fraud with intent to evade tax. Opinion Issue (1)(a) Liquor - Net Sales - 1948 Naurbon L. Perry (sometimes hereinafter referred to as Perry), a special agent of the Internal Revenue Service, testified that he had participated in the investigation of petitioners' 1948 and 1949 income tax returns. He testified that he compiled the material on the basis of which respondent determined petitioners understated their liquor sales by $20,022.40. The records of sales furnished by petitioners were transferred to a schedule. Perry determined that these records totaled $1,267.06 less than the sales total reported*125 on petitioners' 1948 return. He determined sales to Barmer were understated by $20,575.70; to Stanley's Place by $55.98 on one invoice not found in petitioners' records and a $12 correction in multiplication not made in petitioners' copy of another invoice; to Hartzog by a $33.15 difference on one invoice and $171.19 on an invoice not among petitioners' records; to Neely by a $100 correction in addition not made on petitioners' copy of the invoice; to Biloxi Wine Cellar by a $146.88 additional sale which did not appear on petitioners' copy of the invoice; and to Grishman by $194.56 not on any invoice among petitioners' records. After allowing for the $1,267.06 overstatement of 1948 liquor sales, Perry determined a net $20,022.40 understatement of liquor sales. Respondent, on brief, indicated that the amount of the determined understatement of sales to Barmer was arrived at by totaling the checks Barmer claimed to have given petitioners for which petitioners could not produce corresponding invoices to Barmer. Barmer denied petitioners' claims that he frequently purchased whiskey from petitioners in the name of Joe Fore and that he occasionally had petitioners cash checks for him. *126 Lucille, Mitchell Morehead (an employee of petitioners in 1948), and Hartzog (a witness for respondent) all testified that they saw and heard Barmer purchase liquor from petitioners in 1948 in the name of Joe Fore. Robert Buntin, one of petitioners' attorneys, testified that Barmer admitted buying from petitioners in the name of Joe Fore and that Barmer offered to make an affidavit to that effect but later refused to sign the affidavit. In this direct conflict as to statements about matters of fact, Barmer's credibility suffers from the many internal inconsistencies in his testimony. Barmer testified as follows: Q. Did you know a man working there [for petitioners in 1948] by the name of Charlie Smith? A. [By Barmer] Yes, sir. * * *Q. Did you testify just now that you did know a Charlie Smith that works for Mr. and Mrs. Schenck? A. That works for Charlie - no, I didn't testify that he works for them. Q. No, sir. Charlie Smith that works for the Schencks. A. No, sir. I don't know that Charlie Smith works for the Schencks. Q. You do not? A. No, sir. Barmer testified that he did not know all of the people who worked for petitioners' liquor store in 1948, *127 that he did not know Mitchell Morehead, and that he was nevertheless certain Mitchell Morehead did not work there at that time. When asked to explain "If you did not know all of them that worked there, how can you deny that this man works there?" He merely answered, "I don't know him." Barmer testified as follows: Q. Mr. Barmer, when you purchased whiskey from Mr. and Mrs. Schenck, was the ticket always made, the sales ticket or an invoice for that sale? A. Yes, sir. Q. And did you receive a copy for it? A. Yes, sir. Q. Did you ever purchase any whiskey from them where you did not get an invoice? A. During the period of 1948, sir? Q. Yes, sir. A. No, sir. Q. You got an invoice every time? A. Yes, sir. * * *Q. Did you bring all your invoices with you? A. Yes, sir. Q. Do you have them with you now? A. Yes, sir. Barmer, who had denied ever having petitioners cash checks for him, then excused his inability to produce invoices corresponding to any of his checks to petitioners explaining that: A. The State Tax Commission black market of Mississippi requested my records. I submitted my records for them to check on Mr. Schenck to see if he had collected*128 the tax on these invoices and others, and some of them were misplaced, sir. The record as a whole, taken together with Barmer's demeanor or on the stand, lends credence to Lucille's claim that Barmer did pay on invoices to Joe Fore, that petitioners did sometimes accommodate him by cashing his checks, and that credit was extended to him so that he sometimes paid more than one invoice with one check. Under these circumstances we conclude that petitioners have maintained their burden of proof on this issue and that their sales to Barmer were not understated. Respondent's determination that petitioners' 1948 sales to Stanley's Place were understated was based on two invoices. The first, with the top cut off so that no bill-head or date showed, was $55.98. Perry's schedule of invoices presented to him by petitioners lists a sale to Stanley's Place on January 18, 1948, in the amount of $55.98. There is no reason to believe that the invoice introduced to show understatement of sales was different from the invoice shown to Perry by petitioners and treated by him as having been reported on their 1948 return. Respondent introduced into evidence an invoice on which each of two items was*129 three cases of whiskey at $5.40 per case. Each item was incorrectly entered as $10.20. Together with another item for $46.50, the total was $66.90. Someone had corrected the $10.20 extensions on the customer's carbon copy so that each became $16.20 and the total was corrected to $78.90. Respondent's witness, one of the proprietors of Stanley's Place, testified that she "received the items designated" in that invoice and the $55.98 invoice discussed above and that she did "make payment for those." However, there is no evidence that the witness paid $78.90 rather than $66.90. There is no evidence as to who corrected the multiplication on the invoice. Perry's schedule indicates he noted the original of this invoice as a sale for $66.90. Petitioners are to be taxed on what they received under claim of right and not on what they should have received had their arithmetic been accurate. We believe the invoice to be the best indication of what was charged and paid and have no evidence to contradict this belief with regard to the sales to Stanley's Place. We conclude that petitioners did not understate their 1948 sales to Stanley's Place. In this connection, it should be noted that Nathan*130 Wallfish, a certified public accountant testifying for petitioners, stated that if petitioners' invoices had been correctly extended and totaled, they would have amounted to $237,989.80, rather than the $243,584.75 reported on petitioners' return. However, absent evidence to the contrary, we have assumed that petitioners' customers paid the amounts indicated on the invoices tendered them. Respondent determined petitioners failed to include in their reported 1948 sales to Hartzog an amount of $171.19 on an invoice dated March 6, 1948. He also determined that an item of $33.15 which had been added to a $264.08 invoice dated April 8, 1948, was not recorded by petitioners. Hartzog testified that he received the $171.19 invoice from petitioners and that he paid the additional $33.15 on the other invoice. Although we accept Perry's schedule as accurate and complete evidence of petitioners' sales for the purpose of overcoming the presumed correctness of respondent's determination, we are persuaded by Hartzog's testimony that petitioners did understate their 1948 sales to him. Respondent determined petitioners included in their reported 1948 sales to Neely an amount of $398.63 which should*131 have been $498.63. The original of that invoice was incorrectly totaled to $398.63. The carbon copy was corrected by inscribing a "4" to make the total $498.63. Neely testified that he received the items described on the invoice, that he "paid what the invoice called for" but that he had not noticed the correction until it was pointed out to him at the trial. There is no evidence as to who made the correction, but it does not appear to have been made by the same hand that made the invoice. There is no evidence that Neely paid the greater amount rather than the amount originally set forth on the invoice. Respondent determined petitioners included in income on their 1948 return a sale of $155.85 to Biloxi Wine Cellar, but failed to include an additional sale in the amount of $146.88 added to that invoice. No evidence was introduced to contradict the accuracy of the invoice as described in Perry's schedule or to show petitioners received any amount other than the $155.85 noted on that invoice. Respondent determined petitioners failed to include in their 1948 sales to Moody Grishman's Trade Winds Restaurant a sale of $194.56. Grishman stated that he had no present recollection of the*132 amount of any purchase but he did recall having made purchases described by him in an affidavit executed in 1952. The affidavit recited that Grishman made a purchase of whiskey in May 1948 for which he paid $194.56. The affidavit further recited that Grishman had not received an invoice for this purchase, that he paid $20.46 cash on delivery, and that he paid the remaining $174.10, together with two other invoices of $142.82 and $301.54, by a check for $618.46. The check was dated May 29, 1948. Perry's schedule of reported sales lists an invoice for a $174.10 sale on May 10, 1948. Grishman testified that: To be perfectly honest, I don't suppose I could recall any particular figure except the fact that figures are enumerated on this affidavit that I signed which was substantiated at that time by the cancelled checks that I had produced. Grishman then testified that the $618.46 check was in payment of the merchandise on three invoices for $174.10 (May 10, 1948), $142.82 (May 29, 1948), and $301.54 (May 27, 1948), all of which are listed on Perry's schedule of reported sales. We conclude that petitioners' sales to Grishman were not understated on their 1948 return. Issue (1)(b) *133 Liquor - Opening Inventory - 1948 Respondent determined petitioners' opening liquor inventory to be $6,240, the amount shown on petitioners' 1947 return as salvage from the September 1947 hurricane. Petitioners introduced no evidence that their operations during the last few months of 1947 in any way increased the amount of this inventory. Nor did they introduce evidence to substantiate the 1948 return figures as to number of cases sold and size of closing inventory. Accordingly, respondent is sustained as to his determination in this matter. Issue (1)(c) Liquor - Purchases - 1948 Petitioners introduced no evidence to substantiate their purchases of 253 cases of wines and whiskies for which invoices were lost. Petitioners have neither explained nor substantiated the comment on their 1948 return that this figure was derived from their Black Market Tax records. Accordingly, respondent is sustained as to his determination in this matter. Issue (1)(d) Repairs and Maintenance - 1948 Respondent is sustained in his determination to disallow the entire deduction of $1,032.75 for repairs and maintenance. Petitioners have failed to establish respondent's determination was*134 erroneous. Issue (1)(e) Liquor - Expenses Respondent's disallowance of $949.31 of petitioners' claimed $7,133.77 expense schedule is upheld. Petitioners offered no evidence supporting the deductibility of the items at issue, that they were in fact paid, that they were paid during 1948, or that they were not deducted elsewhere on the return. An additional eleven cents is disallowed as an overstatement resulting from an arithmetic error. Issue (1)(f) Liquor - Black Market Tax Mississippi Black Market Tax was based on the liquor wholesaler's purchases during the preceding calendar month. Respondent contested only the amount to be allowed as a deduction - not the general deductibility of such tax payments. Respondent disallowed deductions of $1,506.15 paid in January 1949 on account of December 1948 sales, $939.25 paid for petitioners by someone else, and $1,894.19 described on petitioners' 1948 return merely as "Bal. Paid for June, Dec. & Errors." Section 43, set forth in the margin, 2 requires deductions to be taken in the appropriate year according to whether the taxpayer is on the cash or accrual basis, except when a different method is necessary in order to clearly*135 reflect income. Petitioners claim that they reported income on the cash receipts and disbursements method. This method, when followed consistently so as to accurately reflect income, will normally preclude taking as a deduction in 1948 an item paid in 1949. Petitioners have not shown that this normal rule would not clearly reflect income. Accordingly, respondent is sustained in his decision to disallow the January 1949 payment of Black Market Tax as a deduction in 1948 but to allow it in 1949. Petitioners have not shown they in fact paid the Black Market Taxes apparently paid for them by Pete Murphey and so the deduction of those amounts is disallowed. Petitioners have not explained the item "Bal. *136 Paid for June, Dec. & Errors." They have not shown who paid the tax, when the tax was paid, and the specific reason for payment of that tax. They have not, in fact, shown that that tax was paid at all. Accordingly, that deduction is disallowed. Respondent's determination is sustained. Issue (1)(g) Liquor - Other Adjustments and Closing Inventory The statutory notice sent to petitioners by respondent was brief. The explanation as to that part of the 1948 deficiency resulting from business income is set forth in its entirety as follows: (c) It has been determined that your net profit from business amounted to $54,800.69 rather than $8,337.60 as reported on your return. The record gives no hint as to what is represented by the $7,070.75 denominated "Other adjustments including closing inventory." On brief (p. 54), respondent's entire explanation of that item is: (g) Other adjustments Items (a) to (f) above, even though items on which petitioners had the burden of proof, were made the basis of testimony of respondent's witnesses or cross-examination of petitioners' witnesses, particularly in view of the fact that they are essential elements in support of the allegation*137 of fraud, as more fully set forth in issue V below. The computation discloses a total of $39,392.34 additional income of the $46,463.09 of the total additional profit disclosed by the statutory notice for 1948. As to the balance of $7,070.75, no attempt was made by petitioners to disprove said amount or to show what type adjustments were involved. For all that appears in the record and the briefs, respondent chose a figure, was able to suggest (sometimes only on brief and not on the record) what some items of deficiency were, and then created a "miscellaneous" category as a canvenient label for the remainder of what appears to be an arbitrarily selected total sum. Respondent, on brief, labeled this item "Other adjustments including closing inventory." An increase in closing inventory would decrease the cost of goods sold and result in an increase in net income. But such an increase would necessarily increase the opening inventory for the following year, 1949, which is also before the Court in this proceeding. An increase in opening inventory for 1949 would increase the cost of goods sold and thereby and to that extent decrease net income. The 1948 "miscellaneous" item is $7,070.75*138 while the entire adjustment to 1949 net income assessed by respondent is only $2,956.37. If only half of the 1948 "miscellaneous" item constituted an adjustment to 1948 closing inventory, as vaguely suggested in respondent's brief, then petitioners must be found to have overstated their 1949 net income. Of course, this would make a finding of civil fraud meaningless as to 1949. 3In his opening remarks, respondent's attorney stated, "Due to an adjustment in the 1948 closing inventory, their [petitioners'] income for 1949 was accordingly reduced and at this point, based on the evidence, it might be necessary for the Respondent to file an amendment to the answer to claim in the alternative if the Court were to find that the inventory, as of the end of 1948, was properly reported, and the opening inventory as of January 1, 1949, was overstated by that amount." But no amendment was made, no evidence was introduced, and respondent made no effort to state what adjustments he made to 1948 closing liquor inventory or 1949 opening liquor inventory. Respondent's attorney described his determinations in*139 the following manner: The evidence will disclose that throughout the period involved Petitioner did not maintain records to substantiate their income and expenses as disclosed by the returns, whether such income and expenses involved the wholesale beverage company, the sawmill operation, the slot machine operation, the rental income or the capital gains, and as a result, each year the income of Petitioners was understated by considerable amounts, i.e., approximately $59,084.89 for 1948 composed of the following items: sales understated $20,022.40; beginning inventory overstated $4,759.13; whiskey and wine loss unsubstantiated $8,289.16; closing inventory understated $6,801.70. This is the item on which is the evidence of sale of the Petitioner and it will need to be adjusted in the 1949 year. Expenses overstated $19,085.41. Black Market Taxes overstated $4,339.59. Rental understated $1200. Cost of real estate sold in 1948 $2000. Depreciation overstated $1,687.50, making a total of $59,084.89. As to the year 1949, the items which created the deficiency were: purchases overstated $3,227.80. Expenses overstated $2,751.13. Sales price of real estate sold understated $5500. Cost*140 of real estate overstated $5,549.30. Sales expenses overstated $500. Sawmill sales of crossties completely omitted from the 1949 return $4,653.69, for a total of $17,181.65. However, the statutory notice disclosed respondent's determinations to be that petitioners' 1948 income was understated by $52,410.49 and that $1,200 of personal exemptions were improperly taken. Respondent makes no effort to reconcile these amounts with the $59,084.89 referred to in the opening statement. Similarly, respondent determined petitioners' 1949 net income to be understated by $3,528.07. He makes no effort to reconcile this with the $17,181.65 referred to in the opening statement. We are satisfied that the evidence produced at the trial covers all of the liquor business activities of the petitioners. Based on this entire record, we have found that the petitioners had no other business income such as would sustain the respondent's determination with respect to this issue. Issue (2) Rental - 1948 Respondent is sustained in his determination as to the gross rentals received by petitioners from the Town Tavern in 1948 prior to its sale on June 30 of that year. We have found that petitioners*141 expended $8,676.46 on improvements to this property. Depreciation on such improvements is allowed as a deduction from gross rentals. 4*142 The amount of this deduction is calculated in accordance with our findings as to depreciation adjustments to the basis of this property. With that exception, respondent is sustained in his determination as to understatement of net rental income. Issue (3) Capital Gain - 1948 Under the language of the relevant Code provisions, petitioners' 1948 profit on the sale of the Town Tavern is taxable as a capital gain. 5 It has been so treated by respondent. *143 Respondent is sustained in his determination as to the purchase price of and depreciation allowable or allowed on that property. Respondent's own witness, Hoffer, corroborated Lucille's testimony that petitioners made improvements to the Town Tavern and that those improvements cost approximately the amount indicated by petitioners' evidence. Hoffer is in the building or contracting business. He had ample opportunity to observe construction of the improvements since he was leasing the building at that time. Our findings reflect petitioners' failure to offer proof as to the amount of depreciation allowable or allowed on those improvements. Under section 113(b)(1)(A), set forth at footnote 4, supra, the depreciated value of the improvements increased the basis of the property. It thereby and to that extent diminished recognized gain to petitioners. 6*144 Issue (4) Dependency Exemptions Respondent is sustained in his disallowance of exemptions claimed by petitioners for 1948 on account of their minor children. Respondent, in his statutory notice, found that petitioners' minor children had each earned more than $500 during 1948. Petitioners have not shown that either or both of the children earned less than $500 that year. On brief petitioners admit the children's property was sold in 1948 for a gain of more than $1,200. It is not indicated what each child's share was. Section 25(b)(1)(D), effective for the taxable years before us, 7 allowed exemptions of $600 for each dependent whose gross income was less than $500 during the taxable year. 8*145 Since we have found that each child had a gross income of more than $600 in 1948, we sustain respondent in his determination as to this issue. Issue (5) Itemized Deductions Respondent disallowed petitioners' claimed 1948 medical deductions and deductions for sales tax. Petitioners offered no evidence as to sales tax. Although the certified public accountant who made out petitioners' 1948 return testified that each item in the schedules' 1948 return testified that each item in the schedule of "medical bills" attached to the return was supported by a bill or some other evidence of payment, there is no evidence, other than the schedule itself, supporting the claim that those expenditures were medical expenses. This is particularly true with respect to three items of $14.71, $137.16, and $107.04 described on the schedule as "Hotel Dieu." Even if all the other medical expense items were allowed, when they are reduced by five percent of petitioners' adjusted gross income, 9 the allowable deduction does not exceed the statutory deduction of $1,000 10 and accordingly respondent is sustained in his determination to allow only the statutory deduction. *146 Issue (6) Carry-over of 1947 Net Operating Loss Petitioners' claim to apply their 1947 net operating loss to their 1948 and 1949 incomes is not allowed. The relevant Code provisions, set forth in the margin, 11 reduce the allowable net loss carry-over by the net incomes for the preceding two years. Since petitioners have established neither the amount of the net operating loss incurred in 1947 nor their net incomes for the preceding two taxable years, their claim is disallowed. 12*147 This Court must comment on one aspect of the investigation made into petitioners' returns. One of the internal revenue agents testified that in the course of his investigations he saw petitioners' 1947 return and that he did not consider the net operating loss there claimed to be a proper adjustment to their 1948 income. Yet, he did not examine petitioners' returns for 1945, 1946, or 1947 and does not remember if he even looked at their returns for 1945 and 1946. Nor does it appear that any of respondent's agents in the course of an investigation lasting 90 to 120 days made any effort to find the facts regarding this claimed loss. The loss claimed in 1947 was substantial. If the entire amount were a proper adjustment to petitioners' 1948 income, it would reduce by more than two-thirds the amount of the net additions to income determined by respondent for that year. Under these circumstances it would seem that respondent has not "turned square corners" 13 in moving against petitioners. *148 Issue (7) 1949 Income Respondent has shown that petitioners overstated their 1949 deductions by taking a depreciation item of $228.84 twice on their return. Respondent has further shown that petitioners had income from crosstie sales to the extent of $4,653.69. However, Gordon Fitzgerald, the witness by whom respondent proved this income, testified that petitioners "didn't clear any money in the cross tie business. I think we paid him $1.70 delivered to the port down here or the port of Pascagoula for these ties, and I'm satisfied that they cost him around $1.70 when he got them there." Fitzgerald had been employed by the United States Government as a sawmill specialist and a timber specialist. He observed petitioners' sawmill operations on numerous occasions and had many opportunities to compare those operations with mills owned by others. Respondent has conceded that a Black Market Tax payment of $1,506.15 erroneously deducted by petitioners in 1948 should have been deducted in 1949. Respondent avers that this was taken into account in determining the deficiency as to business income. Respondent offers no explanation as to how the business income deficiency was determined. *149 We are given no clue as to which items were overstated, which understated, and by how much. See discussion of Issue (1)(g), supra. However, petitioners offered no evidence as to business income. We conclude that petitioners have not sustained their burden of disproving the accuracy of respondent's determination and that respondent has not shown that petitioners' business income was understated by an amount greater than that set forth in the statutory notice. Accordingly, we sustain respondent in his determination that petitioners' 1949 business income was understated by the amount set forth in the statutory notice. Respondent is also sustained in his finding as to the profit realized by petitioners on account of the sale by them of property in 1949. Petitioners have not shown respondent's determination to be in error. Although no evidence has been adduced as to the length of time the property was held by petitioners, respondent has treated the profit on the sale of both the building and land as a long-term capital gain, both in his deficiency notice and on brief, and we will so treat this profit. 14*150 Issue (8) Fraud While our rules place the burden of proof upon petitioners with regard to the determination of deficiencies, the law is otherwise in cases of fraud. 15Respondent determined petitioners understated their 1948 net income by $52,410.49 and disallowed $1,200 of exemptions. We have sustained respondent as to approximately $19,000 of the understatements and as to the disallowance of exemptions. On most of the issues in which respondent was sustained, we were constrained to so act not because we were persuaded by the evidence adduced but because of the presumption of correctness attaching to respondent's determinations. This presumption also accounts for our findings with regard to the asserted deficiencies in petitioners' 1949 return. We are not convinced that petitioners sought to evade income by understating sales to Barmer. It is difficult to believe that petitioners created the apparently ficitious Joe Fore. If there*151 was no such person and petitioners made him up, this served only to inflate their income. Barmer's testimony in this regard has been found to be incredible. For the reasons set forth above, we have found that the Joe Fore sales were made to Barmer and that they were reported on petitioners' 1948 return. Perry testified to an extensive and intensive search through several states for petitioners' customers. He found several instances where persons avowed by petitioners to be their customers could not be located. On the other hand, he gave no evidence from which it could be concluded that petitioners had customers whose existence they did not reveal. Except for the asserted understatement of sales to Barmer, Perry found that petitioners in fact overstated their income from liquor sales. We are not shown that petitioners' overstatement of 1948 opening liquor inventory was made with the intent to evade tax. Absent the presumption that respondent's determination is correct, we would not be persuaded that petitioners did understate that inventory. The same is true with respect to overstatements of liquor purchases, repairs and maintenance expenses, and other expenses. Repairs and maintenance*152 expenses were set forth as a total figure without any supporting schedule. The total item was described on the return as "Repairs & Maintenance Schedule." The absence of such a schedule was apparent from a mere inspection of the return. It does not seem probable that one intent upon fraud would make such an error, thereby inviting investigation. Jones, the certified public accountant who made out petitioners' 1948 return, testified as respondent's witness. On cross examination he testified that he had invoices in support of the maintenance figure. No explanation was given for the absence of a supporting schedule. It may have been due to an oversight on Jones' part. In any event, respondent has not shown that the absence of the schedule was due to petitioners' intent to defraud the Government. Respondent presented evidence to convince us of the correctness of his determination as to Black Market Tax deductions, wholly apart from our presumptions. However, there is no evidence of intention to defraud. The same is true with regard to capital gain and rental income. In this connection it should be noted that petitioners' 1947 return indicates rental income apparently from the same properties*153 and in amounts suggesting a rate somewhat greater than that determined for 1948. This inconsistency is apparent from comparison of the faces of the two returns and does not appear to be the act of one attempting to defraud the Government. We are not shown that petitioners' effort to deduct medical expenses and sales taxes was made with intent to evade taxes. Absent the presumption that respondent's determination is correct we would not be persuaded that petitioners did not in fact incur such deductible expenses in 1948. Dependency exemptions were claimed for petitioners' children in 1948 even though the children each had a gross income of more than $600 that year. However, petitioners filed returns for their children disclosing that income. In addition, it appears that even petitioners' attorney is confused as to the law in this matter. On brief he argues that petitioners provided the entire support of those children during 1948 and that petitioners are therefore entitled to claim personal exemptions for the children. Petitioners appear to have misunderstood the law, 16 but there is no showing that they improperly claimed personal exemptions for their children in 1948 with intent*154 to defraud the Government. The 1949 deficiency, too, is based almost in its entirety on respondent's presumed accuracy. No willful intent to defraud is shown. As to only one issue did respondent offer significant proof - income from sawmill operations. As to that issue, respondent's only witness testified that petitioners almost certainly showed no net profit. This witness had many occasions to observe petitioners' operations as well as the sawmill operations of others. On the record as a whole, we hold that respondent has failed to sustain his burden of proving petitioners guilty of fraud with intent to evade tax. Decision will be entered under Rule 50. Footnotes1. All references, unless noted otherwise, are to the Internal Revenue Code of 1939.↩2. SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN. The deductions and credits (other than the corporation dividends paid credit provided in section 27) provided for in this chapter shall be taken for the taxable year in which "paid or accrued" or "paid or incurred," dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credit should be taken as of a different period. * * *↩3. Section 293(b) makes the penalty for fraud a percentage of the deficiency.↩4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. * * *(n) Basis for Depreciation and Depletion. - The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (unadjusted) of Property. - The basis of property shall be the cost of such property; * * *(b) Adjusted Basis. - The adjusted basis for determining the gain or loss from the sale or disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. (1) General rule. - Proper adjustment in respect of the property shall in all cases be made - (A) For expenditures, receipts, losses, or other items, properly chargeable to capital account, but no such adjustment shall be made for taxes or other carrying charges, or for expenditures described in section 23(bb), for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years; (B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount - (i) allowed as deductions in computing net income under this chapter or prior income tax laws, * * *but not less than the amount allowable under this chapter or prior income tax laws. * * * SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (a) Basis for Depreciation. - The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.↩5. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - * * *(4) Long-term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income: * * *50 per centum if the capital asset has been held for more than 6 months. * * *(j) Gains and Losses from Involuntary Conversion and from the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of property used in the trade or business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (a) property of a kind which would properly be includible in the inventory of the taxpayer, if on hand at the close of the taxable year, or (b) property held by the taxpayer primarily for sale to cutomers in the ordinary course of his trade or business. * * * (2) General rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sale or exchanges of capital assets held for more than 6 months. * * *↩6. SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS. (a) Computation of Gain or Loss. - The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized. (b) Amount Realized. - The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.↩7. SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME. * * *(b) Credits for Both Normal Tax and Surtax. - (1) Credits. - There shall be allowed for the purposes of both the normal tax and the surtax, the following credits against net income: * * *(D) An exemption of $600 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $500, * * * ↩8. This provision was amended by section 310 of the Revenue Act of 1951 by striking out $500 and inserting $600 in lieu thereof effective for taxable years beginning after December 31, 1950.↩9. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *(x) Medical, Dental, Etc., Expenses - Expenses paid during the taxable year, not compensated for by insurance or otherwise, for medical care of the taxpayer, his spouse, or a dependent specified in section 25(b)(3), to the extent that such expenses exceed 5 per centum of the adjusted gross income. * * * ↩10. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *(aa) Optional Standard Deductions for Individuals. - (1) Allowance. - In the case of an individual, at his election a standard deduction as follows: (A) Adjusted Gross Income $5,000 or More. - If his adjusted gross income is $5,000 or more, the standard deduction shall be $1,000 or an amount equal to 10 per centum of the adjusted gross income, whichever is the lesser, except that in the case of a separate return by a married individual, the standard deduction shall be $500.↩11. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *(s) Net Operating Loss Deduction. - For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122. SEC. 122. NET OPERATING LOSS DEDUCTION. (a) Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). (b) Amount of Carry-Back and Carry-Over. - * * *(2) Net operating loss carry-over. - (A) Loss for Taxable Year Beginning Before 1948. - Except as provided in subparagraphs (D) and (E), if for any taxable year beginning before January 1, 1948, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the two succeeding taxable years, except that the carry-over in the case of the second succeeding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the intervening taxable year * * *. * * *For the purposes of the preceding sentence, the net operating loss for any taxable year beginning after December 31, 1941, shall be reduced by the sum of the net income for each of the two preceding taxable years * * * ↩12. Petitioners have contended only that the 1947 loss was a net operating loss. Accordingly, we have not considered whether the claimed 1947 loss would qualify for deduction in 1948 and 1949 as a capital loss carry-over under section 117(e)(1).↩13. See concurring opinion of Mr. Justice Douglas in Commissioner v. Lester, - U.S. - (May 22, 1961): While I join the opinion of the Court, I add a few words. In an early income tax case, Mr. Justice Holmes said "Men must turn square corners when they deal with the Government." Rock Island A. & L.R. Co. v. United States, 254 U.S. 141, 143↩. The revenue laws have become so complicated and intricate that I think the Government in moving against the citizen should also turn square corners. * * *14. See Sec. 117(a)(4), set out in relevant part in footnote 5, supra. ↩15. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩16. Exemptions for certain minor children without regard to the amounts of their earnings were not allowed until the enactment of section 151(e)(1)(B) of the Internal Revenue Code of 1954↩.